[Cite as *State v. Bowers*, 2019-Ohio-4273.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J |
| Plaintiff-Appellee | Hon. Craig R. Baldwin, J.<br>Hon. Earle E. Wise, Jr., J. |
| -vs- | |
| | Case No. 2019CA00009 |
| RORY J. BOWERS | |
| Defendant-Appellant | O P I N IO N |

CHARACTER OF PROCEEDINGS: Appeal from the Stark County Court of
Common Pleas, Case No. 2018-CR-1315

JUDGMENT: Affirmed

DATE OF JUDGMENT ENTRY: October 15, 2019

APPEARANCES:

For Plaintiff-Appellee

JOHN D. FERRERO
Stark County Prosecutor

KRISTINE W. BEARD
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza, South – Suite 510
Canton, Ohio  44702-1413

For Defendant-Appellant

AARON KOVALCHIK
116 Cleveland Avenue, N.W.
808 Courtyard Centre
Canton, Ohio  44702

*Hoffman, P.J.*

{¶1} Appellant Rory J. Bowers appeals the judgment entered by the Stark County Common Pleas Court convicting him of sexual battery (R.C. 2907.03(A)(5)) and two counts of gross sexual imposition (R.C. 2907.05(A)(4)) and sentencing him to an aggregate term of incarceration of thirteen years. Appellee is the state of Ohio.

## STATEMENT OF THE FACTS AND CASE

{¶2} In July of 2016, the Ohio Department of Job and Family Services (hereinafter "ODJFS") removed Appellant's two biological daughters, J.B. and K.B., from the home of Appellant and his wife due to concerns of dependency and neglect. The girls were placed in foster care.

{¶3} The girls began counseling in November of 2016 with Mary Seaman, a clinical therapist. The counseling was school-based, and dealt with issues surrounding their removal from the home and foster placement. The case plan promulgated by ODJFS included supervised visitation between the girls and their parents.

{¶4} In April of 2017, while Mary Seaman was in the school lobby during dismissal, J.B. whispered in Mary's ear, "My daddy touched me." Mary contacted the child's foster mother and ODJFS. Visitation was terminated and a criminal investigation was launched.

{¶5} The girls were forensically interviewed during the investigation. The interview was observed by Kathleen Nduati, a nurse practitioner at Akron Children's Hospital. J.B. disclosed Appellant touched her in the vaginal area and buttocks, and made her perform fellatio on him. She stated she observed Appellant do the same things to her sister. K.B. disclosed her father touched her private parts over her clothes. No physical findings were made during a physical exam. However, a finding of sexual abuse

was made as to J.B. K.B. was referred to Northeast Ohio Behavioral Health for a sexual abuse evaluation following an inconclusive diagnosis.

{¶6} Carrie Schnirring, a therapist at Northeast Ohio Behavioral Health, conducted K.B.'s sexual abuse evaluation. K.B. attempted to move away from the topic of sexual abuse because it was "disgusting." Tr. (2A) 65. K.B. missed her mother and indicated to Carrie she wanted to go home. However, K.B. disclosed Appellant would shut the living room curtains and make her and J.B. stand naked in front of him while he sat on the couch with his pants down. She disclosed Appellant touched her private parts with his hands, and she saw him do the same thing to her sister.

{¶7} Detective Talkington of the Canton Police Department brought Appellant to the police station for an interview. Appellant denied the allegations of sexual misconduct. Within twenty-four hours after the interview, Appellant and his wife left for Florida.

{¶8} J.B. and K.B. completed trauma based therapy at Thrive. During therapy, J.B. drew pictures of the sexual abuse committed by Appellant, and referred to him as "devil dad."

{¶9} Appellant was indicted by the Stark County Grand Jury on one count of sexual battery and two counts of gross sexual imposition. Prior to trial, the State moved to permit the child victims to testify via closed circuit television, arguing they would suffer serious emotional harm if they testified in the courtroom before Appellant. The court granted the motion.

{¶10} The matter proceeded to jury trial. Appellant testified at trial, denying the allegations. Appellant was convicted as charged. The court merged one of the counts of gross sexual imposition with the conviction of sexual battery. He was sentenced to eight

years incarceration for sexual battery and sixty months incarceration for gross sexual imposition, to be served consecutively.  It is from the December 17, 2018 judgment of conviction and sentence Appellant prosecutes his appeal, assigning as error:


I. THE TRIAL COURT ERRED WHEN IT VIOLATED APPELLANT'S SIXTH AMENDMENT RIGHT TO CONFRONTATION WHEN IT ALLOWED TESTIMONY TO BE TAKEN BY CLOSED CIRCUIT TELEVISION PURSUANT TO R.C. 2945.481(E).

II. APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.


I.

{¶11}  In his first assignment of error, Appellant argues the court erred in allowing the child victims to testify via closed circuit television at trial.  J.B. was nine years old at the time of trial, and K.B. was seven years old.  He argues the State did not present testimony there was a substantial likelihood the children would suffer serious emotional trauma if they testified in front of Appellant, and further argues the trial court failed to find the element of serious emotional trauma as required by R.C. 2945.481(E).

{¶12}  The trial court found the State could present the testimony of the child victims in this case via closed circuit television pursuant to R.C. 2945.481(E)(3), which provides:

(E) For purposes of divisions (C) and (D) of this section, a judge may order the testimony of a child victim to be taken outside the room in which the proceeding is being conducted if the judge determines that the child victim is unavailable to testify in the room in the physical presence of the defendant due to one or more of the following:

(3) The substantial likelihood that the child victim will suffer serious emotional trauma from so testifying.

{¶13} The Ohio Supreme Court has held testimony of a child victim by videotaped deposition does not violate the Confrontation Clause, as long as the defendant has an opportunity to view the child and the child's demeanor, and has a full opportunity to cross-examine the child. *State v. Self,* 56 Ohio St. 3d 73, 77, 564 N.E.2d 446 (1990). We find the procedure employed in the instant case similarly did not violate the Confrontation Clause, as Appellant was able to see the girls' demeanor, and his counsel had a full opportunity to cross-examine each child. *See State v. Lukacs*, 1st Dist. Hamilton No. C-090309, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 30 (allowing victim's brother to testify by remote video outside the courtroom did not violate the Confrontation Clause where defendant had ample opportunity to cross-examine the witness and see him over the live video feed).

{¶14} Our task as a reviewing court when reviewing a claim the trial court erred in finding a substantial likelihood the child will suffer serious emotional trauma from testifying in the physical presence of the defendant is to determine whether the court's findings are supported by competent, credible evidence. *Self*, *supra*, at 80, *citing C.E. Morris Co. v.*

*Foley Construction Co.*, 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus (1978).

{¶15} The trial court conducted an evidentiary hearing prior to allowing the child victims to testify via closed circuit television, at which two therapists testified: Mary Seaman, who began school-based treatment with the children in November of 2016, and Lindsay DeHaas, the children's trauma therapist from Thrive Counseling Services.

{¶16} Mary Seaman testified the girls had successfully completed their trauma narratives and moved on. The girls were functioning well in their adoptive home and at school, and their negative behaviors had all but gone away. Prior to treatment, the girls had nightmares, bed-wetting and bathroom accidents, engaged in negative attention-seeking behavior, faked injury for attention, were dishonest, and hoarded food. The witness testified "with certainty" if the girls had to see their father in the courtroom, all the work they had done would go away, and they would have to start over. She believed the girls would probably "pee their pants" and be unable to sleep. Tr. (H) 23-24.

{¶17} On cross-examination, Mary Seaman admitted she had not previously dealt with a case where the child victim had to testify, although she had treated numerous child victims. On further questioning from the court, the witness testified when a child victim is in the process of treatment, testifying may make the recovery process longer, but in this case the girls had completed treatment. She testified they could retell but not relive their story without regression, and she believed if they saw their father, they would relive the story.

{¶18} Lindsay DeHaas, who worked with J.B. three days a week at Thrive Counseling Services, testified testifying in front of Appellant would cause J.B. to relive her

experiences and go into aspects of a trauma response. She testified it would cause unnecessary trauma to J.B. to testify in front of her father.

{¶19} Based on the testimony of the two witnesses presented by the State, we find the court's judgment there is a substantial likelihood the girls would suffer serious emotional trauma from testifying in the presence of their father is supported by competent credible evidence.

{¶20} Further, we find the court made the requisite finding of serious emotional trauma. Appellant argues the court can not characterize behaviors as serious emotional trauma when it first characterized those same behaviors as emotional trauma. We disagree. The court made the following findings:

> The Court finds that, based upon the testimony presented, there is a substantial likelihood that the child witnesses will suffer emotional trauma if they are required to testify in the Courtroom in front of the defendant. Specifically, the Court finds that, prior to receiving therapy, the witnesses exhibited "trauma related behaviors," such as bed-wetting, dishonesty, having accidents in pants, hoarding food, and engaging in negative attention seeking behaviors. The Court further finds that the witnesses are "done telling their story" from a therapeutic standpoint, meaning that they have worked through their feelings and behaviors. Based upon the testimony presented by Mary Seaman, the Court finds that, if the witnesses were required to testify in the Courtroom in front of the defendant, all of the prior therapy that they would have completed would be undone and that the

trauma related behaviors would return.  While Ms. Seaman testified that any child would be traumatized by testifying in front of an alleged perpetrator, the Court finds that given the status of recovery of the witnesses, the impact of such testimony would result in the return of the trauma related behaviors and, as such, serious emotional trauma.

According, the Court finds that the State of Ohio has demonstrated that there is a substantial likelihood that the child witnesses in this case will suffer serious emotional trauma if required to testify in front of the defendant.

**{¶21}** Judgment Entry, November 29, 2018.

**{¶22}** The trial court clearly found a substantial likelihood of serious emotional trauma twice in its judgment, and we find the omission of the word "serious" from the court's opening discussion does not render the later findings invalid under the statute.

**{¶23}** The first assignment of error is overruled.

II.

**{¶24}** In his second assignment of error, Appellant argues the judgment is against the manifest weight and sufficiency of the evidence.

**{¶25}** In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and

a new trial ordered.'" *State v. Thompkins*, 78 Ohio St. 3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1983).

**{¶26}** An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1991).

**{¶27}** Appellant was convicted of sexual battery in violation of R.C. 2907.03(A)(5):

(A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:

(5) The offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person.

**{¶28}** Sexual conduct is defined by R.C. 2907.01(A):

"Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

**{¶29}** Appellant was also convicted of gross sexual imposition in violation of R.C. 2907.05(A)(4):

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

**{¶30}** R.C. 2907.01(B) defines "sexual contact:"

"Sexual contact" means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

**{¶31}** J.B. testified Appellant touched her buttocks with his hands, and made her put her mouth on his penis. She testified she observed the same thing happen between Appellant and K.B. She testified Appellant did this when her mom wasn't at home. She testified Appellant would make them take their clothes off, and would pull his pants down. She disclosed the conduct to her mother, who told Appellant, and Appellant got mad and yelled at them.

{¶32} K.B. testified Appellant made her and her sister suck his "private," which she described as the part he uses to go to the restroom. She testified his pants would be off when this happened. She testified she did not know if he used his hands to touch her.

{¶33} Sara Brown, the foster mother with whom the girls lived from July of 2016, until May of 2018, when they were placed in their adoptive home, testified the Sunday after J.B. reported sexual abuse to Mary Seaman, J.B. disclosed sexual abuse to her [Sara]. She testified discussing sexual abuse caused anxiety to K.B., who did not want to talk about it.

{¶34} Mary Seaman testified she did not interfere in the ongoing investigation, but would listen to the girls about the topic of sexual abuse if the girls brought it up first. She testified J.B. would crawl on her lap, talk like a baby, and cry when talking about the abuse. K.B. would cough and gag when she talked to Mary Seaman about her dad putting his penis in her mouth.

{¶35} The girls were forensically interviewed during the investigation. The interview was observed by Kathleen Nduati, a nurse practitioner at Akron Children's Hospital. J.B. disclosed Appellant touched her in the vaginal area and buttocks, and made her perform fellatio on him. She stated she observed Appellant do the same things to her sister. K.B. disclosed her father touched her private parts over her clothes. No physical findings were made during a physical exam. However, a finding of sexual abuse was made as to J.B. K.B. was referred to Northeast Ohio Behavioral Health for a sexual abuse evaluation following an inconclusive diagnosis.

{¶36} Carrie Schnirring conducted the sexual abuse evaluation of K.B. for Northeast Ohio Behavioral Health. Schnirring testified K.B. would try to move

conversation away from the topic of bad touches because it was disgusting. K.B. was emotionally and physically upset during her evaluation. The witness testified K.B. desperately wanted to return home to her mother, yet still disclosed sexual abuse by Appellant. K.B. told Schnirring she would be standing and her dad would sit on the couch. K.B. disclosed Appellant would touch her vaginal area with his hands, and closed the curtains prior to any touching. K.B. also stated the same thing happened with J.B. Because K.B. badly wanted to return home, Schnirring ruled out a secondary agenda in her disclosure of sexual abuse.

{¶37} Lindsay DeHaas, J.B.'s trauma therapist, described images J.B. drew during therapy related to sexual abuse. J.B. referred to her father as "devil dad."

{¶38} The testimony of the girls at trial was sufficient evidence, if believed by the jury, to support the convictions of sexual battery and gross sexual imposition.

{¶39} Appellant argues the girls' testimony is not credible because they denied sexual abuse when they were removed from the home in 2016. He also argues the jury failed to take into consideration the fact he denied any wrongdoing.

{¶40} Mary Seaman, who had worked with the girls concerning their initial removal from their home, testified in her experience, delayed disclosure of sexual abuse is "usually the way it is." Tr. (2A) 31. Knowing the girls, she testified she did not believe they were feeling safe enough to disclose when first removed from home. She testified sometimes it takes time for a child to process what happened to them and recognize it was wrong. She additionally testified sometimes there is a sense of survival and self-preservation right after children are removed from their home. She testified, "I can't see those girls

being able to talk about what happened to them shortly after they were removed." Tr. 2(A) 32.

**{¶41}** Appellant denied the allegations both to police and at trial. However, the jury also heard evidence Appellant left for Florida less than twenty-four hours after his interview with police.

**{¶42}** Based on all the evidence presented at trial, we find the jury did not lose its way in finding the girls' testimony credible and rejecting Appellant's claim of innocence, and the judgment is not against the manifest weight of the evidence.

**{¶43}** The second assignment of error is overruled.

**{¶44}** The judgment of the Stark County Common Pleas Court is affirmed.

By: Hoffman, P.J.
Baldwin, J. and
Wise, Earle, J. concur